## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **TK HOLDINGS INC.,** *et al.* | Case No. 17–11375 (BLS) |
| **Debtors.** [1] | Jointly Administered |
| TK HOLDINGS INC., *et al.* | Adv. Pro. No. 17-50880 (BLS) |
| **Plaintiffs,** | |
| – against – | |
| STATE OF HAWAI'I, by its Office of Consumer Protection, GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, STATE OF NEW MEXICO, *ex rel.* HECTOR BALDERAS, Attorney General, *et al.*, | |
| **Defendants.** | |

## DEBTORS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. § 105(a)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................7

I.      THE RELEVANT PARTIES AND EVENTS PRECEDING THIS
        BANKRUPTCY PROCEEDING ......................................................................7

II.     THE RELEVANT ACTIONS .........................................................................10

        A.      The State Actions........................................................................10

        B.      The Individual Actions ................................................................12

ARGUMENT .................................................................................................................14

I.      THIS COURT SHOULD ENJOIN THE STATE ACTIONS AGAINST
        THE DEBTORS UNDER SECTION 105 OF THE BANKRUPTCY
        CODE.............................................................................................................14

        A.      Section 105(a) of the Bankruptcy Code Grants This Court
                Authority to Enjoin the State Actions. ........................................14

        B.      The Preliminary Injunction Factors Weigh In Favor of Enjoining
                The State Actions Against The Debtors.......................................16

                1.      The Debtors are Likely to Restructure Successfully...................16

                2.      The Debtors Would Be Irreparably Harmed if the State
                        Actions Are Allowed to Proceed. ..............................17

                3.      The Balance of Harms Favors a Stay.......................................20

                4.      Granting the Requested Injunctive Relief Is In the Public
                        Interest........................................................................22

II.     THIS COURT SHOULD ALSO ENJOIN THE STATE ACTIONS
        AGAINST TKJP. ...........................................................................................24

        A.      The AGs' Claims Against TKJP Are Related to the Debtors
                Bankruptcy.....................................................................................25

        B.      The Equities Weigh in Favor of Enjoining the State Actions
                Against TKJP. ................................................................................26

III.    THIS COURT SHOULD ENJOIN ALL ACTIONS AGAINST THE
        CONSENTING OEMS....................................................................................28

        A.      This Court Has Related-To Jurisdiction Over the Actions Against
                the Consenting OEMs. ...................................................................29

1.      The Actions Against the Consenting OEMs Implicate the Debtors' Contractual Indemnification Obligations....................................29

2.      Allowing the Actions to Proceed Against the Consenting OEMs Would Risk the Prejudicial Effects of Collateral Estoppel Against the Debtors....................................................31

B.      It Is Appropriate to Enjoin the Actions Against the Consenting OEMs. ........................................................................................32

1.      The Debtors Share an Identity of Interest With the Consenting OEMs....................................................................33

2.      Allowing the Actions to Continue Against the Consenting OEMs Would Adversely Affect the Debtors' Restructuring Efforts. ................................................................................34

C.      The Equities Weigh in Favor of Enjoining the Actions Against the Consenting OEMs.................................................................37

CONCLUSION........................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin,*
    788 F. 2d 994 (4th Cir. 1986) .......................................................................28, 29, 36

*In re Am. Film Techs., Inc.,*
    175 B.R. 847 (Bankr. D. Del. 1994) ..................................................................22, 32

*Arnold v. Garlock, Inc.,*
    278 F.3d 426 (5th Cir. 2001) ...................................................................................34

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.),*
    488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ...............29, 30

*Belcufine v. Aloe,*
    112 F.3d 633 (3d Cir. 1997)....................................................................................29

*In re Broadstripe, LLC,*
    402 B.R. 646 (Bankr. D. Del. 2009), *as amended* (Mar. 10, 2009)............................23

*In re Combustion Eng'g,*
    391 F.3d 190 (3d Cir. 2004)....................................................................................29

*In re Eagle-Picher Indus., Inc.,*
    963 F.2d 855 (6th Cir. 1992) ...................................................................................16

*In re Elpida Memory, Inc.,*
    No. 12-10947 (CSS), 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) .................25

*In re FiberTower Network Servs. Corp.,*
    482 B.R. 169 (Bankr. N.D. Tex. 2012)....................................................................18

*Garrity v. Leffler (In re Neuman),*
    71 B.R. 567 (S.D.N.Y. 1987)...................................................................................14

*Harbison-Walker Refractories Co. v. ACE Prop. & Cas. Ins. Co. (In re Global Indus. Techs.),*
    303 B.R. 753 (Bankr. W.D. Pa. 2004) .....................................................................28

*In re Iezzi,*
    504 B.R. 777 (Bankr. E.D. Pa. 2014) ......................................................................19

*In re Japan Airlines Corp.,*
    No. 10-10198 (JMP), 2010 WL 1050075 (Bankr. S.D.N.Y. Jan. 28, 2010) ..............25

*Kos Pharm., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)......................................................................16

*Lane v. Phila. Newspapers, LLC*,
  423 B.R. 98 (E.D. Pa. 2010) ....................................................................16

*In re Lomas Fin. Corp.*,
  117 B.R. 64 (S.D.N.Y. 1990)....................................................................32

*McCartney v. Integra Nat'l Bank N.*,
  106 F.3d 506 (3d Cir. 1997)..............................................................14, 35

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
  474 U.S. 494 (1986)..................................................................................36

*In re Monroe Well Service, Inc.*,
  67 B.R. 746 (Bankr. E.D. Pa. 1986) .............................................35, 37, 38

*In re Mystic Tank Lines Corp.*,
  544 F.3d 524 (3d Cir. 2008)......................................................................22

*N.L.R.B. v. Superior Forwarding, Inc.*,
  762 F.2d 695 (8th Cir. 1985) .............................................................15, 20

*New Jersey v. W.R. Grace & Co. ("W.R. Grace II")*,
  412 B.R. 657 (D. Del. 2009)............................................................23, 26, 29

*In re Otero Mills, Inc.*,
  21 B.R. 777 (Bankr. D.N.M. 1982) ..........................................................35

*Pacor Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984)..............................................................25, 29

*Penn Terra Ltd. v. Dep't of Envtl. Res. of Pa.*,
  733 F.2d 267 (3d Cir. 1984)........................................................14, 15, 22

*In re Phila. Newspapers, LLC*,
  407 B.R. 606 (E.D. Pa. 2009) .............................................23, 28, 29, 31

*Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*,
  199 B.R. 498 (Bankr. D. Del. 1996) ........................................................22

*S.E.C. v. First Fin. Grp. of Tex.*,
  645 F.2d 429 (5th Cir. 1981) ...................................................................20

*Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*,
  440 B.R. 369 (Bankr. E.D. Pa. 2009) ......................................................34

*In re Sec. Gas & Oil, Inc.*,
    70 B.R. 786 (Bankr. N.D. Cal. 1987) ...................................................14, 15

*In re SemCrude, L.P.*,
    428 B.R. 82 (Bankr. D. Del. 2010) (Shannon, J.) ........................................31

*In re Takata Airbag Product Liability Litig.*,
    MDL No. 2599 (S.D. Fla. June 12, 2017)...................................................13

*In re Third Eighty-Ninth Assoc.*,
    138 B.R. 144 (S.D.N.Y. 1992)...................................................................35

*Union Trust Phila., LLC v. Singer Equip. Co. (In re Union Trust Phila., LLC)*,
    460 B.R. 653 (E.D. Pa. 2011) ..............................................................31, 38

*United States v. Nicolet*,
    857 F.2d 202 (3d Cir. 1988)......................................................................22

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2003)......................................................................16

*In re W.R. Grace & Co.*,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ...................34

*W.R. Grace & Co. v. Chakarian ("W.R. Grace I")*,
    386 B.R. 17 (Bankr. D. Del. 2008) .................................................... *passim*

**Statutes**

11 U.S.C. § 105(a) ............................................................... *passim*

11 U.S.C. § 362.................................................................... *passim*

11 U.S.C. § 1502(4) ....................................................................25

11 U.S.C. § 1520(a) .....................................................................5

12A V.I.C. § 301 ........................................................................11

14 V.I.C. § 600-14 ......................................................................11

H.R.S. §§480-15 ........................................................................10

N.M. Stat. Ann. § 57-12-1 ..............................................................12

**Other Authorities**

S. Rep. No. 989, 95th Cong., 2d Ses. 51.................................................15

# PRELIMINARY STATEMENT[2]

After over a year of intense and difficult negotiations, the Debtors and their worldwide affiliates secured a deal in principle with their largest creditor constituency and a potential purchaser ("***the Global Transaction***"). The Global Transaction will preserve their business, maximize value, and, importantly, promote public safety by ensuring the supply of replacement airbag inflators to complete vehicle recalls. But the deal is fragile, not yet final, and subject to strict contractual and legal deadlines. For the Global Transaction to have a meaningful chance of succeeding, a stay of related litigation is needed.

Reaching the finish line will require the Debtors to focus their time and resources and their efforts to coordinate with a diverse group of 15 Consenting OEMs from around the globe,[3] a purchaser undertaking its largest deal ever, and Takata entities on five continents. Developments in hundreds of pending civil actions, as well as the financial and administrative burdens imposed by those cases, could upset the delicate balance required to consummate the Global Transaction. Even once the documents are finalized, the parties will need to invest resources and attention to complete the Global Transaction. At the same time, the Debtors' senior management must devote their time and energy to running a manufacturing enterprise with over 13 different North American production, test, and other facilities, and more than 14,500 employees in the United States and

---

[2] Capitalized terms used in this Brief and not otherwise defined, shall have the meanings ascribed to them in the Declaration of Scott E. Caudill in Support of Debtors' Chapter 11 Petitions and First Day Relief ("***First Day Decl.***"). This Brief also refers to the Declaration of Theodore E. Tsekerides in Support of Debtors' Motion for a Preliminary Injunction Pursuant to 11 U.S.C. § 105(a), dated July 13, 2017 ("***Tsekerides Decl.***") exhibits thereto ("***Tsekerides Decl. Ex. __***") and the Declaration of Scott E. Caudill in Support of Debtors' Motion for a Preliminary Injunction Pursuant to 11 U.S.C. § 105(a), dated July 8, 2017 ("***Caudill Decl.***"). Unless otherwise noted, all emphasis is added and internal citations are omitted.

[3] BMW, Mercedes-Benz, Fiat Chrysler Automobiles, Ford, General Motors, Honda, Jaguar Land Rover, Mazda, Mitsubishi, Nissan, Peugeot, Subaru, Toyota, Volkswagen, and Volvo.

Mexico, during a tumultuous time for the company, as well as attend to this bankruptcy and the regulatory demands.

As a result, the Debtors respectfully request that this Court exercise its jurisdiction and equitable authority to stay, until February 27, 2018 (the current deadline to complete the Global Transaction), all actions against them that may be subject to an exception to the automatic stay, as well as those actions against certain non-debtors that involve the Debtors' inflator products and could interfere with the Debtors' restructuring. Granting the requested preliminary injunction will benefit the Debtors' estates and the public interest by maximizing the likelihood of a successful restructuring, while causing minimal prejudice to affected parties. The Debtors do not seek to deny anyone a day in court, but they simply seek a reasonable period of time to get through a difficult period with minimal additional burdens from ongoing civil litigation.

### *The State Actions*

Although automatically protected from certain litigation, the Debtors remain under siege. First, potential gaps in the protections under Section 362 leave the Debtors exposed to litigating three suits brought by Hawaii, New Mexico, and the U.S. Virgin Islands (the "***States***"), which argue that their claims fall within the so-called "police powers exception" to the automatic stay. Second, even if those matters are stayed against the Debtors, the Debtors nevertheless remain exposed by these actions and two others brought by Hawaii and the U.S. Virgin Islands (the five actions being the "***State Actions***"), which assert similar claims against non-debtors Takata Corporation ("***TKJP***") and certain of the Consenting OEMs, all of whom have in turn asserted their own claims against the Debtors for (among other things) indemnification and contribution.

Permitting the continued prosecution of the State Actions against the Debtors materially threatens the success of these Chapter 11 Cases and the Debtors' ability to maximize recoveries for injured individuals. Specifically, absent a stay, the State Actions would drain the Debtors' limited financial resources and divert the attention of the Debtors' senior management, and that of its parent company, TKJP, away from what should be their singular focus: working to successfully consummate the Global Transaction and confirm a chapter 11 plan for the benefit of all creditors. The recent actions by the Attorney General for the United States Virgin Islands ("*USVI*") confirm the threat to the Debtors' Chapter 11 Cases and demonstrate the need for relief. Acting on news reports of impending bankruptcy, the USVI Attorney General secured an *ex parte* order directing TKH to deposit more than $8 million into an escrow account to satisfy any future monetary judgment. On June 26, 2017, the day *after* Takata filed for bankruptcy, the USVI vowed to "vigorously enforce" that order.[4]

Enjoining the State Actions against non-debtors TKJP and the Consenting OEMs is appropriate because claims against these entities inexorably threaten the Chapter 11 Cases, including negotiations necessary to consummate the Global Transaction and confirm the Chapter 11 Plan. In addition to exposing the Debtors to liability via contractual and equitable indemnity claims, the State Actions will burden many of the TKJP and Consenting OEM officials who have indispensable roles in the restructuring. As just one example, the state of Hawaii recently obtained an order requiring the production of documents from TKJP's chairman, Shige Takada, and intends to pursue his

---

[4] *See* Tsekerides Decl. Ex. A (June 26, 2017 USVI AG Press Release).

deposition. Mr. Takada is, of course, deeply involved in managing the Company's restructuring efforts.

Further, the Consenting OEMs are Takata's customers (and the Debtors' largest creditors) and represent the Debtors' lifeline during these Chapter 11 Cases, serving effectively as DIP lenders. Through a series of agreements—which required nearly a year to negotiate and still remain fragile—the Consenting OEMs have made substantial financial commitments and accommodations to allow (i) the Debtors' continued operations during the Chapter 11 Cases to bridge the period to consummate the Global Transaction, (ii) the going concern sale to Key Safety Systems, Inc. (the "***Plan Sponsor***") to remain viable and allow for the continued employment of substantially all of the Debtors' 14,500 employees, and (iii) Takata to meet its obligations to the United States Government under a Plea Agreement (discussed *infra*). These agreements-in-principle lay the foundation for a successful sale and restructuring, but the State Actions—as well as the Individual Actions discussed below—threaten that foundation by endangering the Consenting OEMs' continued support for the restructuring, and the ability of the Debtors to timely complete each step needed to consummate the proposed Global Transaction.

Finally, because the agreements between Takata (including TKH) and the Consenting OEMs contain contractual indemnification provisions in favor of the OEMs, a stay is necessary to preserve the status quo. Continued prosecution of the State Actions against the Consenting OEMs and TKJP would negatively affect the Debtors' estates and would force the Debtors to either devote scarce resources and attention to the State Actions or face the unacceptable risk of adverse rulings that could negatively affect the Debtors in subsequent proceedings.

### The Individual Actions

Hundreds of cases have been filed throughout the United States in which plaintiffs have asserted claims against the Debtors, TKJP, and the Consenting OEMs based on Takata airbag inflators (the "***Individual Actions***" and together with the State Actions, the "***Actions***"). Where the Debtors are defendants or third-party defendants, those actions are stayed automatically against the Debtors,[5] but not against the other non-debtor defendants. Accordingly, the Debtors seek to extend the automatic stay to claims against the Consenting OEMs in the Individual Actions because, just as with the State Actions, in the absence of a stay, the Debtors would likely either have to: (i) continue to devote resources and attention to those actions, diminishing the estate and interfering with senior management's ability to satisfy vital restructuring objectives needed to consummate the Global Transaction, (ii) potentially incur obligations for legal defense bills for certain Consenting OEMs, and/or (iii) accept the prejudicial effects of collateral estoppel, indemnity, and record taint, thereby impairing all creditors' distribution rights. These "choices" would significantly and negatively affect the restructuring process and chances for successful Chapter 11 Cases.

### The Requested Relief

The relief requested is necessary to prevent irreparable harm to the Debtors' estates and their prospects of successfully emerging from chapter 11. The relief would give the Debtors a much needed respite from protracted litigation and allow them to focus on their restructuring and finalizing the Global Transaction. The Global Transaction will require continued, complex, and coordinated efforts between the Debtors, TKJP,

---

[5] And Section 1520 will similarly operate to stay these proceedings against TKJP, once the Japanese insolvency proceeding is recognized. *See* 11 U.S.C. § 1520(a).

Customers (including OEMs not yet part of the Customer Group), the Plan Sponsor, and (perhaps) other creditor groups to finalize a deal. The Debtors are firmly on the path to achieving their goals in the restructuring; they have dedicated the limited, remaining personnel and other resources toward protecting motorists around the world and ensuring the continued administration of worldwide recalls.

In contrast to the irreparable harm to the Debtors, a stay would cause no harm or prejudice to the States, their constituents, or the plaintiffs in the Individual Actions ("***Individual Plaintiffs***"). Public safety concerns are already addressed by TKJP's obligations under the Plea Agreement and Restitution Order entered by the United States District Court for the Eastern District of Michigan ("***DOJ Order***"), and the stringent recall obligations imposed by the National Highway Traffic Safety Administration (**"*NHTSA*"**). The DOJ Order imposes mechanisms to ensure the safety of the motoring public and compensate individuals for personal injury. And, to comply with its NHTSA obligations, Takata has facilitated, and will continue to facilitate, recalls. If anything, a stay will protect the interests of residents of the USVI, Hawaii, and New Mexico (the three jurisdictions whose governments have brought actions), along with consumers nationwide, by increasing the likelihood that the Debtors consummate the Global Transaction and restructure in a timely manner, conserving resources and ensuring continuation of a critical supply of airbags and airbag inflator replacement parts for recalls.

## STATEMENT OF FACTS

I.    **THE RELEVANT PARTIES AND EVENTS PRECEDING THIS BANKRUPTCY PROCEEDING**

The First Day Declaration contains a detailed discussion about ruptured airbag inflators containing phase-stabilized ammonium nitrate ("***PSAN Inflators***") that prompted federal regulators and the OEMs to initiate exhaustive recalls of vehicles in the U.S. and overseas, with support from TKH, TKJP, and NHTSA, triggering an avalanche of civil litigation. The First Day Declaration details the indemnification and warranty obligations as between the Takata entities and the OEMs, as well as the civil penalties owed to NHTSA. In addition, the First Day Declaration explains that, on January 13, 2017, TKJP, the Department of Justice, Criminal Division, Fraud Section ("***DOJ***"), and the U.S. Attorney's Office for the Eastern District of Michigan announced and submitted to the U.S. District Court for the Eastern District of Michigan a criminal plea agreement (DOJ Order). *See* First Day Decl. ¶12. Under the DOJ Order, TKJP committed to pay, directly or through its affiliates or subsidiaries, Restitution Payments of: (i) $850 million to automobile manufacturers, which must be paid within five (5) days after the closing of a sale of Takata, which must occur by no later than February 27, 2018 and (ii) $125 million to recompense individuals who suffered (or will suffer) personal injury caused by the malfunction of a PSAN Inflator, which, as required, was paid to the DOJ on or around March 29, 2017. *See* First Day Decl. ¶12. If the remaining Restitution Payments are not satisfied in full by March 4, 2018, the DOJ retains the right to withdraw the DOJ Order and pursue additional criminal charges and penalties against all Takata entities, including TKH. *See id.* ¶13.

Despite the legal and regulatory complexities associated with the unprecedented and highly publicized recall, when the Debtors filed these Chapter 11 Cases on June 25, 2017 ("*Petition Date*"), they did so with a proposed deal nearly fully negotiated that would provide a path for a relatively quick and successful emergence of the Takata entities' business. *See id.* ¶8. Specifically, after months of negotiations, Takata (including the Debtors) is on the verge of executing a transaction with the Plan Sponsor for the sale of substantially all of the Takata entities' global operations. This transaction will have the support of the Consenting OEMs, who, collectively, purchased approximately 90% of PSAN Inflators sold by Takata as of March 2017 and hold a substantial majority of the unsecured claims against the Debtors' estates. *See id.* ¶¶8, 15. The Debtors, TKJP, the Debtors' other foreign affiliates, the Plan Sponsor, and the Consenting OEMs have agreed in principle to the sale of the Debtors' assets to the Plan Sponsor, which will be consummated under the Chapter 11 Plan. *Id.* ¶8. Although the relevant parties are close to a deal, there is still much work to be done that will require preserving the status quo as well as the full attention of all parties and their executives and counsel, to ensure the sale occurs by February 27, 2018. *See id.* ¶13; *see also* Caudill Decl. ¶4.

The Consenting OEMs have entered into a Global Accommodation Agreement that provides the Takata entities with, among other things, much needed liquidity during the insolvency proceedings and serves as a bridge to the closing of the proposed Global Transaction and consummation of the Chapter 11 Plan. *See* First Day Decl. ¶108. Under this agreement, and additional agreements contemplated thereunder, the Consenting OEMs have agreed to provide the Debtors with (i) liquidity enhancement from the acceleration of payment terms on outstanding purchase orders; (ii) restrictions on the

Consenting OEMs' ability to re-source parts and programs to the Debtors' competitors; (iii) limitations on when the Consenting OEMs' may assert or otherwise accelerate setoffs against the Debtors' accounts receivable; and (iv) a commitment to purchase raw materials and furnished goods at established prices in the event of trigger events. *See id.* The Global Accommodation Agreement also sets forth milestones related to finalizing, executing, and filing the Global Transaction Documents to ensure that the Debtors can close and emerge from Chapter 11 by February 27, 2018. *See id.* ¶109. Failure to meet these milestones would constitute a breach that would entitle the Consenting OEMs to terminate the Global Accommodation Agreement and pull the Debtors' go-forward funding during the Chapter 11 Cases. *See id.*

The accommodations provided to the Debtors are "central to the Debtors' ability to continue to operate during the Chapter 11 Cases." *Id.* ¶110. Further, "[w]ithout the Consenting OEMs' concessions provided for in the Global Accommodation Agreements, and the accommodation agreement in Japan, the Global Transaction would not be possible." *Id.* Specifically, through the accommodation agreements, the Consenting OEMs are agreeing to forbear from exercising important rights to support the Debtors' liquidity and operations during the bankruptcy and to facilitate completing the Global Transaction. In addition, the Global Transaction itself could never be consummated without the support of the Consenting OEMs, as no transaction sponsor would be willing to acquire the Debtors' assets without the OEM indemnity currently being negotiated. These contributions, and others that have already been made or are anticipated to be made by the OEMs in connection with the Global Transaction, are essential to the

Debtors' ability to achieve a value-maximizing restructuring and preserve the Debtors' business lines.

## II.    THE RELEVANT ACTIONS[6]

### A.    The State Actions

On May 13, 2016, the State of Hawaii, by its Office of Consumer Protection, sued TKH, TKJP, and Honda entities (***"Honda"***)[7] in state court asserting a claim under its consumer protection statute. Hawaii seeks a permanent injunction barring Takata "from engaging in their unfair and deceptive conduct," civil penalties per violation in accordance with H.R.S. §§480-15, restitution, and disgorgement. On June 16, 2017, Honda filed cross-claims against TKH and TKJP, alleging indemnity, fraudulent concealment, and misrepresentations. The Hawaii Action is in active discovery. In fact, the state court recently issued an order requiring Shige Takada, TKJP's Chairman, to produce documents, and the State will likely seek to take his deposition.

On May 24, 2017, Hawaii filed a separate, but similar, action against certain Consenting OEMs,[8] alleging violations of its consumer protection statute also predicated on Takata's airbag inflators. It did not sue any Takata entity in that case. In June 2017, the defendant OEMs filed third-party complaints against TKH and TKJP alleging indemnification, reimbursement, contribution, fraud, and misrepresentation.

On May 25, 2016, the Government of the USVI sued TKH, TKJP, and Honda in state court asserting causes of action under its consumer protection laws, USVI's

---

[6] *See* Compl., Ex. A (Pending Actions).

[7] Specifically, Honda Motor Co., Ltd., American Honda Motor Co., Inc., and Honda of America Mfg., Inc.

[8] Toyota (specifically, Toyota Motor Corporation, Toyota Motor Sales, U.S.A. Inc., and Toyota Motor Engineering & Manufacturing North America, Inc.); Nissan (specifically, Nissan Motor Company, Ltd., and Nissan North America, Inc.); and Ford (specifically, Ford Motor Company).

Criminally Influenced and Corrupt Organizations Act, 14 V.I.C. §§600–14, USVI's Consumer Fraud & Deceptive Business Practices Act, 12A V.I.C. §301, and USVI common law. The USVI seeks civil penalties, administrative fines, an injunction requiring defendants to cease their alleged violations of the law and to expand their public education efforts, restitution, and disgorgement.

The USVI moved for a preliminary injunction at the time it filed the complaint, seeking an order requiring TKH to place money in a court-administered escrow account to pay any potential monetary relief. A hearing on the preliminary injunction motion was scheduled for June 28, 2017. On June 16, 2017, the USVI acted *ex parte* to advance the hearing, which was advanced to June 19, 2017, at which point the court denied the USVI's motion without prejudice. After press reports suggested that Takata would file for bankruptcy on June 25 or 26, the USVI filed a renewed emergency motion for preliminary injunction and obtained, again *ex parte*, an emergency hearing for Monday, June 26, 2017. On the Sunday before the hearing (June 25, 2017)—the same day TKH filed for bankruptcy—and without providing notice or an opportunity to be heard, the USVI court entered an *ex parte* order directing TKH to deposit "forthwith" more than $8 million with the court. Upon learning of this bankruptcy, on June 28, 2017, *sua sponte*, the USVI court issued an Order staying the action against TKH, TKJP, and Honda and ordered that no further proceedings take place absent a further order from that court. *See* Tsekerides Decl. Ex. B (June 28, 2017 USVI Order).

On May 16, 2017, the USVI filed a separate, but similar, action against certain Consenting OEMs [9] predicated on Takata's airbag inflators. It did not sue any Takata

---

[9] The same Toyota, Nissan, and Ford entities identified in n.8, *supra*, along with Toyota de Puerto Rico Corp.

entity in that case. In June 2017, the defendant OEMs filed third-party complaints against TKH and TKJP alleging indemnification, reimbursement, contribution, fraud, and misrepresentation. On June 30, 2017, *sua sponte*, the USVI court issued an Order staying that action and ordered that no further proceedings take place in the absence of an order from that court. *See* Tsekerides Decl. Ex. C (June 30, 2017 USVI Order).

On January 20, 2017, the State of New Mexico sued TKH, TKJP, and several Consenting OEMs,[10] among others, in state court alleging that the defendants violated New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq*., seeking, among other things, $5,000 per defective airbag inflator in the state as well as $5,000 per day for each day that the defendants allegedly hid or obscured the defects. In June 2017, multiple Consenting OEMs[11] filed cross-claims against TKH and TKJP alleging indemnification, reimbursement, contribution, fraudulent concealment, and misrepresentation.

### B.    The Individual Actions

The Individual Actions fall into three distinct categories. *First*, individual plaintiffs have brought more than 100 personal injury or wrongful death actions against TKH, TKJP, and the Consenting OEMs, alleging that the Consenting OEMs installed a defective airbag inflator manufactured by Takata in their automobiles. Of those, 48 are

---

[10] Honda (specifically, Honda Motor Co., Ltd. and American Honda Motor Co., Inc.); Ford (specifically, Ford Motor Company); Toyota (specifically, Toyota Motor Corp., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc.); BMW (BMW of North America, LLC and BMW Manufacturing Co., LLC); Mazda (specifically, Mazda Motor Corp. and Mazda Motor of America, Inc.); Subaru (specifically, Fuji Heavy Industries, Ltd. n/k/a Subaru Corporation and Subaru of America, Inc.); Mitsubishi (specifically, Mitsubishi Motors Corp. and Mitsubishi Motors North America, Inc.); Nissan (specifically, Nissan Motor Co., Ltd. and Nissan North America, Inc.); Fiat Chrysler Automobiles (specifically, FCA US LLC and Fiat Chrysler Automobiles N.V.); Volkswagen/Audi (specifically, Volkswagen Group of America, Inc. and Audi of America, LLC); General Motors (specifically, General Motors Company and General Motors LLC); Jaguar Land Rover (specifically, Jaguar Land Rover North America); and Mercedes-Benz (specifically, Mercedes-Benz USA, LLC). The actions against certain of the Consenting OEMs have been dismissed without prejudice.

[11] BMW, Ford, Honda, Mazda, Mitsubishi, Nissan, and Toyota.

consolidated in a multidistrict litigation pending in the United States District Court for the Southern District of Florida (the "**MDL**"). More than 90 other cases have been filed in federal or state courts across the country. Litigating these actions requires Takata's oversight in more than a dozen states, including California, Florida, and Louisiana. Consenting OEMs have brought a myriad of cross-claims against Takata in these cases. These actions are stayed against the Debtors under Section 362 of the Bankruptcy Code, and will be stayed as to TKJP once its Japanese insolvency proceeding is recognized.

*Second*, plaintiffs in the United States and Canada have brought more than 40 actions seeking damages for economic loss. Almost all of these are class actions, and of those in the United States, nearly all of the class actions are centralized in the MDL. Those actions principally allege that the recall of Takata's airbag inflators caused the plaintiffs to sustain a loss in the value of their vehicle and/or to incur various out-of-pocket costs related to the recall.[12] Consenting OEMs have brought cross-claims against Takata regarding these economic loss actions.

*Finally*, more than 200 plaintiffs have filed actions seeking damages from the OEMs for the alleged unavailability of replacements for recalled Takata airbag inflators ("**Lemon Law Actions**"); the OEMs, in turn, have filed third-party complaints therein against TKH and TKJP. Like the personal injury and wrongful death actions, the economic loss and Lemon Law Actions are stayed as to the Debtors and are expected to be stayed as to TKJP in connection with its Chapter 15 proceeding. The common thread

---

[12] Subject to final approval on October 25, 2017, Toyota, BMW, Mazda, and Subaru have settled certain of these economic loss claims pending in the MDL. *See In re Takata Airbag Product Liability Litig.*, MDL No. 2599 (S.D. Fla. June 12, 2017) (ECF No. 1798) (Order Preliminarily Approving Class Action Settlement and Certifying Settlement Class). Excluded from the settlement are claims brought by automotive recyclers. This Motion excludes the settled economic loss claims against these four defendants, so as to allow the settlement to proceed to fruition.

binding each of the Individual Actions is that they all arise out of the Takata entities' PSAN Inflators.

## ARGUMENT

## I.    THIS COURT SHOULD ENJOIN THE STATE ACTIONS AGAINST THE DEBTORS UNDER SECTION 105 OF THE BANKRUPTCY CODE.

Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under Section 105(a), this Court has broad, equitable powers to "assure the orderly conduct of the reorganization proceedings." *Garrity v. Leffler (In re Neuman*), 71 B.R. 567, 571 (S.D.N.Y. 1987) (citing *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985)); *see also McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997) (bankruptcy court has the authority to enjoin an activity that threatens the reorganization process or impairs the court's jurisdiction with respect to a case before it). Here, the Court should use this power to enjoin the State Actions so the Debtors can have the breathing room they need to complete their reorganization.

### A.    Section 105(a) of the Bankruptcy Code Grants This Court Authority to Enjoin the State Actions.

It is well-settled that Section 105 of the Bankruptcy Code may be used to enjoin governmental civil actions against a debtor, even where the suit might otherwise be permitted to continue under one of Section 362(b)'s exceptions to the automatic stay. *See Penn Terra Ltd. v. Dep't of Envtl. Res. of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984) (finding, with respect to action by state's agency to enforce environmental clean-up order against debtor, that bankruptcy court in "its discretion, may issue an appropriate injunction, even if the automatic stay is not operative"); *see also In re Sec. Gas & Oil, Inc.,* 70 B.R. 786, 793 (Bankr. N.D. Cal. 1987) ("[i]ssuance of an injunction under Section 105 is

appropriate where the threatened state activity would unduly interfere with the proper functioning of the Bankruptcy Code").

Indeed, the legislative history of Section 362 recognizes that "acts not covered by the automatic stay are not beyond regulation by the bankruptcy court." *Id.* at 792 (citing S. Rep. No. 989, 95th Cong., 2d Ses. 51) ("[Section 362(b)] lists seven exceptions to the automatic stay. *The effect of an exception is not to make the action immune from injunction*.").[13] With respect to a bankruptcy court's broad discretion, Congress observed:

> The court has ample other powers to stay actions not covered by the automatic stay…By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, *the court will have to determine whether a particular action which may be harming the estate should be stayed.*

S.Rep. No. 989, 95th Cong., 2d Ses. 51, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5837. Accordingly, Section 105 authorizes the bankruptcy courts to enjoin actions brought by governmental entities where those actions interfere with or impede a debtor's reorganization or pose a threat to the debtor's estate. *See N.L.R.B. v. Superior Forwarding, Inc*., 762 F.2d 695, 699 (8th Cir. 1985) ("It is of particular importance that bankruptcy courts be able to determine factually, on a case by case basis, whether regulatory proceedings will threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory . . . ."); *see also Penn Terra Ltd.*, 733 F.2d at 273–274 ("[L]ittle harm is done to congressional purpose in allowing

---

[13] The Debtors do not concede that the State Actions fall within 362(b)(4)'s exception to the automatic stay. In any event, the Court need not reach that issue because an injunction under Section 105(a) is nevertheless appropriate.

some latitude in favor of State regulatory powers when interpreting § 362(b), since if, in a particular case, that latitude results in an impermissible dilution of federal bankruptcy policy, then the bankruptcy court may always issue an injunction tailored to fit those circumstances.").

     **B.**     **The Preliminary Injunction Factors Weigh In Favor of Enjoining The State Actions Against The Debtors.**

Under the four-factor test for obtaining injunctive relief, courts balance the debtor's reasonable likelihood of success; the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; the balance of harms between the debtor and its creditors; and the public interest in an injunction. *See W.R. Grace & Co. v. Chakarian*, 386 B.R. 17, 33 (Bankr. D. Del. 2008) ("*W.R. Grace I*"); *see also Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 342 F.3d 191, 196 (3d Cir. 2003). These considerations are "to be balanced" and are not "meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). Applying this test here, the Court should enjoin the State Actions against the Debtors.

     *1.*     *The Debtors are Likely to Restructure Successfully.*

The reasonable likelihood of success has been interpreted by bankruptcy courts as "the equivalent of the debtor's ability to successfully reorganize." *See, e.g., Lane v. Phila. Newspapers, LLC*, 423 B.R. 98, 106 (E.D. Pa. 2010); *see also W.R. Grace I*, 386 B.R. at 33 (citing *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1096 (9th Cir. 2007) ("a bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful reorganization")). Here, it is highly likely that the Debtors will successfully restructure and complete the Global Transaction, especially if protected from the burdens

of the State Actions. The Debtors filed these Chapter 11 Cases on the verge of consummating a deal that would lead to a quick and successful restructuring. *See* First Day Decl. ¶8. After many months of meetings, diligence sessions, and negotiations, Takata, including the Debtors, reached an agreement in principle with the Plan Sponsor for the sale of substantially all of Takata's global operations. *Id.* This transaction has the support of the Consenting OEMs. *Id.* The Debtors, TKJP, the Plan Sponsor, and the Consenting OEMs have agreed that the sale of Takata's assets to the Plan Sponsor will be consummated under the Chapter 11 Plan. The Debtors' prospects for a successful restructuring, while still at a delicate stage, weigh in favor of the requested preliminary injunction. *See, e.g.*, *W.R. Grace I*, 386 B.R. at 33 (successful reorganization was likely where no party suggested otherwise).

> 2.    *The Debtors Would Be Irreparably Harmed if the State Actions Are Allowed to Proceed.*

To continue on the path toward a successful restructuring, it is essential that the Debtors, their executive leadership team, and their professionals remain focused on completing the Chapter 11 Plan. The Debtors' senior management, and in particular Scott Caudill (TKH's COO) and Ken Bowling (CFO of Takata North America and the non-automotive safety division of Takata), are actively involved in the restructuring initiatives, as well as in operating the Debtors' business on a day-to-day basis. *See* Caudill Decl. ¶¶4–5, 7. The Debtors' officers and directors are spending nearly all their time and efforts developing business and financial plans, finalizing relevant agreements, engaging in discussions with the Plan Sponsor, the Customer Group, and other Takata Customers that might become Consenting OEMs, and attending to other matters relating to the Chapter 11 Cases. *See id.* ¶4–5. Management will also need to focus on requests

from the official committees of unsecured creditors, which were appointed on July 6 and 7, 2017, as well as the reporting requirements in the bankruptcy process. *See id.* ¶5. Achieving these important goals does, and will continue to, consume substantially all the time and resources of the Debtors' senior employees. *See id.* If the State Actions are not stayed, the Debtors' leadership would be forced to prepare for and potentially attend hearings, assist in preparing discovery responses, prepare for and participate in depositions, and help analyze and develop the Debtors' legal defenses rather than focusing on, and completing, critical restructuring tasks. *See id.* ¶¶6–8.

In addition, the costs of defending the State Actions, including attorneys' fees and costs, discovery, trial preparation and trial, would diminish the Debtors' estates. Because Takata's airbag inflators, and Takata's design, testing, and knowledge of issues with the airbag inflators, are front and center in the State Actions, the Debtors would have no choice but to divert critical resources away from the Chapter 11 Cases and their estates to develop their factual and legal defenses. Such a substantial diversion of resources would threaten the recovery to creditors under the Chapter 11 Plan and, if substantial enough, would threaten the Debtors' ability to consummate a plan and successfully restructure.

The irreparable harm that Debtors face here is not "speculative, theoretical, or remote." *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182–90 (Bankr. N.D. Tex. 2012) (recognizing irreparable harm debtor faced was "not speculative, theoretical, or remote" because the regulatory agency had already made "concrete threats" against debtor). Rather, as exhibited by the multiple *ex parte* actions taken by the USVI Attorney General and their post-petition statements, the States intend to prosecute their cases against the Debtors vigorously. In fact, on the *same day* Takata filed its bankruptcy

petitions, the USVI sought, and the state court entered, an *ex parte* order requiring TKH to deposit "forthwith" more than $8 million into escrow. The very next day, despite acknowledging that Takata had filed for bankruptcy, the USVI issued a press release stating: "We intend . . . to vigorously *enforce* Judge Dunston's order directing Takata's U.S. subsidiary to escrow funds to ensure relief for, and the safety of, Virgin Islands' consumers." Tsekerides Decl. Ex. A (June 26, 2017 USVI AG Press Release). And, although the USVI state courts have ordered a stay of that litigation and the related case against several Consenting OEMs, nothing prevents the USVI from moving to lift these stays, thus requiring the Debtors to respond and divert their attention and resources away from the restructuring process.[14]

Moreover, because Hawaii is represented by the *same* outside counsel as the USVI, the actions of counsel in the USVI substantiates the Debtors' concrete concern that the States will attempt to pursue their own parochial interests to the detriment of the other creditors, and the public at large. *See In re Iezzi*, 504 B.R. 777, 779–80 (Bankr. E.D. Pa. 2014) (citing *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995) (the automatic stay "also protects creditors")). If these efforts by the States go unchecked, other states will be encouraged to file copycat actions, substantially increasing the time and resources the Debtors must devote to defending those actions, and effectively derailing the Debtors' efforts to restructure.

The irreparable harm to the Debtors is not limited to the costs of defending the actions or the distraction from the Chapter 11 Cases. Rather, the weight of the cumulative effects of the continuation of the State Actions will endanger the Debtors' Chapter 11

---

[14] Prudence thus dictates that, should this Court grant the relief requested herein, the two USVI Actions should be included in any such Order to avoid having to scramble to obtain relief from this Court should events transpire in the state court proceedings that would seek to undo the *sua sponte* stays entered there.

Cases and prospects for consummating the Global Transaction. *See N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d at 699 (finding that based upon a fact specific analysis, "the time and effort of management, as well as the expense required in defending against [regulatory proceedings], threatened the assets of the debtor's estate"); *see also S.E.C. v. First Fin. Grp. of Tex.*, 645 F.2d 429, 440 (5th Cir. 1981) ("To the extent that the exercise of this jurisdiction threatens the assets of the debtor's estate, the bankruptcy court may issue a stay of those proceedings."). The Eighth Circuit has observed:

> It is of particular importance that bankruptcy courts be able to determine factually, on a case by case basis, whether regulatory proceedings will threaten the assets of the estate because otherwise the court's power to preserve the estate over which it presides is illusory: the costs incurred in defending against charges may deplete the estate.

*N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d at 699. The same is certainly true here. The State Actions threaten to disrupt the Debtors' efforts to complete the Global Transaction and restructure; thus ultimately harming the public.

### 3.    *The Balance of Harms Favors a Stay.*

The balance of harms weighs decidedly in the Debtors' favor given that the relief requested will neither injure nor prejudice the States or consumers.[15] *First*, even in the absence of the State Actions, the relief the States seek is largely being achieved by other means. In fact, under the Third Amendment to the Coordinated Remedy Order with NHTSA dated December 9, 2016, Takata is working with the OEMs to develop and

---

[15] Perversely, the State Actions might actually hinder the Debtors' ability to ensure the safety of the consumers the States purport to represent. If the State Actions are permitted to proceed, high-ranking Takata officials would need to devote substantial time to those cases, rather than negotiating the proposed Global Transaction, fulfilling the Debtors' obligations thereunder, and running the Debtors' day-to-day operations. Further, if there are insufficient funds to consummate the Chapter 11 Plan, the entire deal would fall apart, which would encumber the Debtors' ability to manufacture, assemble, and ship replacement kits for recalls.

implement a surveillance and testing plan that will ensure the safety of desiccated PSAN inflators. In addition, Takata is already required, and will continue, to cooperate with NHTSA to coordinate and accelerate these remedial programs.[16] Accordingly, all affected consumers in USVI, Hawaii, and New Mexico, along with consumers throughout the nation, are already receiving and will continue to receive free replacement airbag inflators *without* the State Actions continuing. In fact, Takata has cooperated with the OEMs and alternate airbag inflator suppliers to ensure that replacement airbag inflators are made available expeditiously from all possible sources. In short, staying the State Actions will *not* impede or detract from Takata's existing, federally-supervised recall efforts, while allowing the actions to proceed might delay or halt the supply of replacement airbag inflators by increasing the chances that the Debtors are unable to successfully restructure.

*Second*, there is also a remedy available for those who have sustained personal injuries caused by the rupture of a PSAN Inflator. Under the DOJ Order, TKJP has already paid $125 million to compensate those who have suffered (or will suffer) personal injury caused by the rupture of a PSAN Inflator. *See* First Day Decl. ¶86. Further, the Chapter 11 Plan will propose mechanisms for addressing personal injury and economic damage claims against the Debtors. And creating recovery funds to address claims for personal injury, wrongful death, or other similar claims arising out of or relating to an injury caused by PSAN Inflators, in addition to the DOJ Restitution Fund,

---

[16] As of June, 2017, over sixty million (60,000,000) non-desiccated PSAN Inflators in the United States and more than sixty four million (64,000,000) non-desiccated PSAN Inflators outside of the United States have been recalled or will be subject to recalls based on announced schedules. *See* First Day Decl. ¶7. In addition, the NTHSA Consent Order requires that TKH implement a series of actions, including the phasing out of the manufacture and sale of non-desiccated PSAN Inflators by the end of 2018. *Id.* ¶55. Takata recently filed with NHTSA Defect Information Reports relating to an additional 2.7 million PSAN inflators in the United States that were desiccated with calcium sulfate.

will benefit all consumers, *including* those on behalf of whom the State Actions are brought. As such, even with a stay of the State Actions, consumers in each of the States who have been (or may be) injured by Takata airbag inflators will have recourse. Thus, any alleged harm from a stay of the State Actions is outweighed by the benefits of a successful reorganization.[17]

*Finally*, merely delaying the prosecution of the States' claims does not outweigh the irreparable harm to the Debtors should they fail to successfully restructure due to the continuation of the State Actions.

>    4.    *Granting the Requested Injunctive Relief Is In the Public Interest.*

The public interest weighs heavily in favor of granting the requested relief. As the Third Circuit found in *Penn Terra*, "in some individual situations, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." 733 F.2d at 273. In such cases, bankruptcy courts have the discretion to issue an injunction. *See id*. This is such a case.

"In the context of bankruptcy proceedings, the 'public interest' element means 'the promoting of a successful reorganization.'" *In re Am. Film Techs., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) ("It is 'one of the paramount interests' of this court to assist the Debtor in its reorganization efforts."); *see also Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*, 199 B.R. 498, 501 (Bankr. D. Del. 1996) ("[T]here is a strong public interest in promoting a successful Chapter 11

---

[17] There is also no practical benefit in allowing the State Actions to continue. Under Section 362(b), collection of any judgment against the Debtors would be stayed. *See United States v. Nicolet*, 857 F.2d 202 (3d Cir. 1988); *In re Mystic Tank Lines Corp.*, 544 F.3d 524 (3d Cir. 2008). Thus, it would be a waste of resources and a needless distraction to allow the State Actions to continue.

reorganization."). In *W.R. Grace II*, the district court similarly observed that "timely resolution of the bankruptcy estate" is in the public interest. *New Jersey v. W.R. Grace & Co.*, 412 B.R. 657, 666 (D. Del. 2009) ("*W.R. Grace II*"). As explained above, the State Actions will needlessly imperil the Debtors' reorganization, and, at a minimum, delay the establishment of mechanisms to address creditors' claims, thus *harming* the public interest. *See id.* ("Actions that needlessly delay a fair settlement agreement deprive claimants of their proceeds while preventing the debtor from completing its reorganization.").

Courts have also held that the interest in a successful reorganization may trump a claimant's right to immediate adjudication of its claims. *See In re Phila. Newspapers, LLC,* 407 B.R. 606, 617 (E.D. Pa. 2009) ("*Phila. Newspapers I*"). In other words, "[b]ased on the irreparable harm to the Debtors that could ensue in the absence of injunctive relief, '[a]n injunction is proper to prevent the threatened extinction of a business.'" *In re Broadstripe, LLC*, 402 B.R. 646, 659 (Bankr. D. Del. 2009), *as amended* (Mar. 10, 2009) ("In the face of the potential for significant injury to the Debtors' business value and reorganization efforts and the potential loss of service to its customers, the public interest favors granting the requested injunctive relief to enable the Debtors to attempt to reorganize in chapter 11."). In this case, the public interest would be served by preliminarily enjoining the State Actions to ensure that the Debtors are able to confirm a chapter 11 plan and remain (through the expected sale) a viable global supplier of airbags and replacement inflators. A successful restructuring is especially important to the public interest because of the need to expeditiously complete the unprecedented number of recalls involving the Debtors' inflators, the need to ensure a

stable and continuous supply of replacement parts to the OEMs, and the need to preserve the diminishing value of the Debtors' estates in connection with the proposed sale.

In fact, staying the State Actions and fostering a successful restructuring will promote another important public policy objective – promoting public safety. Takata anticipates that its Customers will require *millions* of additional replacement kits in the years ahead. If the Debtors cannot consummate the Global Transaction and restructure successfully, they will be unable to meet recall and repair demands. Thus, there would likely be a shortfall of needed replacement kits, causing chaos in the automotive industry and substantial harm to the Consenting OEMs and the millions of consumers who have purchased or leased vehicles with recalled PSAN Inflators.

Other important public policy objectives are also implicated by the relief requested herein, and would be promoted if such relief is granted. Failure to consummate the Global Transaction could result in a liquidation of Takata's assets, including the Debtors' assets; which, in turn, would close dozens of manufacturing plants worldwide and eliminate over 14,500 jobs. *See* First Day Decl. ¶19. Based on its market share, Takata's failure would ripple through the entire automobile market, forcing car manufacturers to delay production schedules while other airbag manufacturers attempt to make up for the shortfall. *See* Caudill Decl. ¶9. At the same time, consumers all over the world could experience increased prices and reduced choices. In sum, enjoining the State Actions would *protect*, not harm, the public interest.

## II.     THIS COURT SHOULD ALSO ENJOIN THE STATE ACTIONS AGAINST TKJP.

As discussed above, it is appropriate for a court to issue an injunction where a governmental unit's activity would unduly interfere with the debtor's bankruptcy

proceedings. *See supra* Section I.B. Here, declining to enjoin the State Actions against TKJP would upset the coordinated insolvency proceedings, which hinge on complementary and interdependent agreements to effectuate the worldwide sale of substantially all of Takata's assets.[18] *See* First Day Decl. ¶53.

### A.    The AGs' Claims Against TKJP Are Related to the Debtors' Bankruptcy.

Although Section 105 of the Bankruptcy Code does not provide an independent source of federal subject matter jurisdiction, related-to jurisdiction exists where "the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) ("An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."). Here, the effect on the Debtors' is not just conceivable, it is manifestly clear.

Under the DOJ Order, TKJP is required to make its remaining Restitution Payments no later than five days following consummation of the sale of substantially all of Takata's entities, which must occur no later February 27, 2018. *See* First Day Decl. ¶13. This Court should undertake every effort to ensure that TKJP, and indirectly, the Debtors, are able to make those payments on time because if TKJP defaults, the DOJ could pursue additional criminal charges and penalties against all Takata entities,

---

[18] *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *1 (Bankr. D. Del. Nov. 20, 2012) (noting that foreign proceeding in Tokyo Court was recognized under Chapter 15 of Bankruptcy Code the month after petition was filed, with provisional relief granted in interim); *In re Japan Airlines Corp.*, No. 10-10198 (JMP), 2010 WL 1050075, at *1 (Bankr. S.D.N.Y. Jan. 28, 2010) (granting preliminary injunction against acts detrimental to debtor's reorganization, based on there being "substantial likelihood that the Foreign Representative will be able to demonstrate that the Japan Proceeding constitutes a 'foreign main proceeding' as defined in section 1502(4) of the Bankruptcy Code").

including TKH. *See id.* Further, compliance with the DOJ Order is a prerequisite to consummating the Global Transaction because "no purchaser or sponsor, including the Plan Sponsor, was or would be willing to close a sale transaction without the assurance that the sale proceeds would be applied first to those obligations owed to the DOJ." *Id.* ¶89. And without the sale to the Plan Sponsor, the Global Transaction, which is integrated into the coordinated insolvency proceedings in the U.S. and Japan, would come undone, and the Debtors would lack sufficient funds to provide distributions to the personal injury and wrongful death claimants. *See id.* ¶19. The Debtors would also not be able to preserve enough global liquidity to ensure the ongoing manufacture and supply of component parts, including replacement kits, so as to prevent harm to the public. *See id.* ¶20. Moreover, because of the global nature of the proposed sale, TKJP's employees, too, are necessary to the ongoing negotiations. *See id.* ¶¶90–113. Distracting TKJP's top executives from the deal's finer details with litigation (which, ironically, seeks the precise remedial oversight and compliance measures with which the Debtors and TKJP are already complying globally, and upon which the Chapter 11 Plan depends) would threaten the Debtors' restructuring efforts.

**B.    The Equities Weigh in Favor of Enjoining the State Actions Against TKJP.**

As explained above, a party is entitled to an injunction if it can demonstrate: (i) the debtor's reasonable likelihood of successful reorganization; (ii) the risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors weighs in favor of injunction; and (iv) the public interest is served by an injunction. *See supra* Section I.B; *W.R. Grace II*, 412 B.R.

at 669. As explained above, it is highly likely that the Debtors will successfully restructure, especially if protected from the distractions of the State Actions.

Aside from risking default on the DOJ Order, the Debtors would suffer irreparable harm if the State Actions are allowed to proceed against TKJP, a foreign debtor and their Japanese parent company. These Chapter 11 Cases are part of, and are integral to, the implementation of the proposed Global Transaction, which will involve Takata entities across 20 countries. *See* Tsekerides Decl. Ex. D (June 27, 2017 Hearing Tr.) 8:8–10. The proposed Global Transaction also contemplates, through coordinated U.S. and Japanese insolvency proceedings, the sale of the Japanese debtors' assets. *See* First Day Decl. ¶19. But the key documents, though close, are not yet final. *See id.* ¶8. And, although the Debtors and TKJP are separate legal entities, maintaining the momentum necessary to execute and fulfill the interrelated and complementary sale documents, and to ensure the sale is consummated before the February 2018 deadline, requires the complete attention of high-level executives from both the Debtors and TKJP. *See id.* ¶¶90–113; Caudill Decl. ¶¶4–8. Moreover, given the USVI's recent conduct, there is little reason to believe that it or other States will refrain from seeking so-called injunctive relief against TKJP if those actions proceed against the Debtors' parent.

In addition, given that in many instances, the airbag inflators that are the subject of the litigation were designed, developed, and manufactured by the Debtors, the Debtors would likely be drawn into any litigation against TKJP, even if the actions against the Debtors were stayed. For the reasons explained in Section I.B.2 above, this would cause a diversion of the Debtors' attention and resources that would threaten the success of the reorganization plan. *See also* Sections III.A.2 and B, *infra*.

Finally, as discussed above, the balance of harms and public policy both weigh in favor of enjoining the State Actions against TKJP because, while the States may be delayed in prosecuting their claims, the Debtors' successful restructuring is critical to their ability to support the ongoing recalls and thereby ensure the safety of the constituents that the States purport to represent.

For these reasons and those set forth above with respect to the Debtors, the Court should enjoin the State Actions against TKJP.

## III.   THIS COURT SHOULD ALSO ENJOIN ALL ACTIONS AGAINST THE CONSENTING OEMS.

Allowing either the State Actions or the Individual Actions to proceed against the Consenting OEMs threatens the Global Transaction and the Debtors' reorganization. This Court should therefore, as many courts have done before, enjoin the claims against the non-debtor Consenting OEMs. *See A.H. Robins Co., Inc. v. Piccinin*, 788 F. 2d 994, 999–1003 (4th Cir. 1986) (courts may enjoin actions against non-debtors in "unusual circumstances", *i.e.*, where the continuation of cases would adversely impact debtor's reorganization efforts); *Phila. Newspapers I*, 407 B.R. at 616 ("The power of the Court to stay actions against Non-Debtors, under section 105(a), is clear."); *see also Harbison-Walker Refractories Co. v. ACE Prop. & Cas. Ins. Co. (In re Global Indus. Techs.)*, 303 B.R. 753, 760 (Bankr. W.D. Pa. 2004) ("The fact that the action does not name Debtor is not dispositive" when determining whether to enjoin action against non-debtor).

Courts in the Third Circuit—including this Court—have adopted a three-step inquiry to determine whether to enjoin claims against a non-debtor: (i) whether the bankruptcy court has subject matter jurisdiction over the proceeding against the non-debtor; (ii) whether it is appropriate to expand the protections of the automatic stay to the

non-debtor under 11 U.S.C. § 105; and (iii) whether issuing a preliminary injunction is a proper exercise of discretion. *See W.R. Grace I*, 386 B.R. at 30; *Phila. Newspapers I*, 407 B.R. at 611. Under each of these inquiries, a stay of the Actions is appropriate.

### A.    This Court Has Related-To Jurisdiction Over the Actions Against the Consenting OEMs.

#### 1.    The Actions Against the Consenting OEMs Implicate the Debtors' Contractual Indemnification Obligations.

A bankruptcy court has related-to jurisdiction over claims against a non-debtor where the suit against the non-debtor implicates the debtor's contractual indemnification obligations to the non-debtor. *See A.H. Robins*, 788 F.2d at 999 (refusing to enjoin a suit against a non-debtor that has contractual indemnification claims against the debtor would "defeat the very purpose and intent" of the Bankruptcy Code's protections); *see also Belcufine v. Aloe*, 112 F.3d 633, 637 (3d Cir. 1997) (the rationale first articulated in *A.H. Robins* "has since been adopted by this Circuit"); *In re Combustion Eng'g*, 391 F.3d 190, 231 (3d Cir. 2004) (recognizing that courts have exercised related-to jurisdiction over claims against non-debtors where express indemnification obligations, derivative liability, or a debtor-manufactured product was at issue). *Pacor* and its Third Circuit progeny "instruct" courts to ask, among other things, whether the filing of the action against the non-debtor triggered a claim for indemnification from the debtor. *Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 315 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) (bankruptcy court had related-to jurisdiction because the filing of the class action against the non-debtor triggered a claim for defense costs against the debtor). And this analysis applies with equal force to actions brought by governmental units against a non-debtor. *See, e.g.*, *W.R. Grace II*, 412 B.R. at 669 (contractual

indemnity made Department of Environmental Protection's claims against non-debtors "related to" the bankruptcy, and upholding injunction).

In *Lower Bucks*, the Third Circuit affirmed the bankruptcy court's exercise of related-to jurisdiction over a dispute between bondholders and an indenture trustee regarding the validity of a third-party release because the relevant bond documents "required [the debtor] to indemnify the indenture trustee," so the action shared the "necessary nexus" with the bankruptcy. 571 F. App'x at 142, n.2; *see also In re Lower Bucks Hosp.*, 488 B.R. at 312 (complaint against the non-debtor had an "immediate effect" on the bankruptcy estate because it triggered a claim for defense costs against the debtor). There, because the relevant indemnification provision covered "any and all claims, losses, damages or liabilities," it was triggered "regardless of whether the claims [against the non-debtor] ultimately result[ed] in a finding of liability." *Id.* at 316. So, related-to jurisdiction existed over the non-debtor action because it would have affected the estate. *See id.*

The relevant documents here contain comparable language. For example, Exhibit E states that the Debtors must defend, indemnify, and hold Honda free and harmless "from and against any loss, cost, liability, claims, demands, or lawsuits . . . arising from or relating to" Takata's inflators. Tsekerides Decl. Ex. E (Honda North American Purchase and Sale Agreement (Nov. 1, 2006) § 6.1). Likewise, Exhibit 6 provides that the Debtors must indemnify Nissan "in full against all loss, liability, damages, costs and expenses . . . arising directly or indirectly out of" Takata's performance under their sales agreement, including claims, actions, or lawsuits alleging, among other things: (i) any design, manufacturing, or warning defect to any part; or

(ii) any violation of any law, rule, or regulation applicable to Takata. Tsekerides Decl. Ex. F (Nissan Master Purchase Agreement (Sept. 13, 2004) §12.1). Agreements with the remaining Consenting OEMs provide for similar indemnification rights. *See* Tsekerides Decl. Exs. G-P[19]

Just as this Court recognized in *In re SemCrude, L.P.*, 428 B.R. 82 (Bankr. D. Del. 2010) (Shannon, J.) with contractual indemnification, the effect of lawsuits against the Consenting OEMs on the Debtors' estates goes "beyond" situations where a debtor requests a stay based solely on the potential for as-yet unasserted common law indemnity claims. *See id.* at 99–100. To protect the estates from litigation "scatter[ed]" around the country, this Court should exercise jurisdiction over the Actions against the Consenting OEMs and enjoin their continued prosecution. *Id.* at 100. A list of the Actions for which the requested relief is to apply is attached as Ex. A to the Complaint.

    2.    *Allowing the Actions to Proceed Against the Consenting OEMs Would Risk the Prejudicial Effects of Collateral Estoppel Against the Debtors.*

To determine jurisdiction, and stay actions against non-debtors, courts also look to the risks to a debtor of prejudice from collateral estoppel and record taint. *See Union Trust Phila., LLC v. Singer Equip. Co. (In re Union Trust Phila., LLC)*, 460 B.R. 653, 657 (E.D. Pa. 2011) (in subsequent suits, debtor could be bound by "critical factual and legal issues" determined in the proceedings against non-debtor); *Phila. Newspapers I*, 407 B.R. at 615 (same). The risks of collateral estoppel support enjoining actions against a non-debtor because, for example, "it is not possible for the debtor to be a bystander to a

---

[19] *See, e.g.*, Tsekerides Decl. Ex. G (Volkswagen Group of America, Inc. Terms and Conditions of Purchase (Jul. 31, 2008) § 15(a) (providing that the Debtors must defend, indemnify, and hold Volkswagen harmless against "all damages, losses, claims, liabilities and expenses . . . arising out of resulting from", among other things, any defective Takata product).

suit which may have a $20 million issue preclusion effect against it in favor of a prepetition creditor." *In re Am. Film Techs.*, 175 B.R. 847, 853–55 (Bankr. D. Del. 1994) (rejecting argument that, even if collateral estoppel applied, suits against non-debtors should not be enjoined because the non-debtors were allegedly independently liable) (quoting *In re Lomas Fin. Corp.*, 117 B.R. 64, 67 (S.D.N.Y. 1990)).

Here, the potential magnitude of the preclusive effects is even greater than in *Lomas*—possibly exponentially greater. That case involved one action, for $20 million, against two non-debtors. *See In re Lomas Fin. Corp.*, 117 B.R. at 65. By comparison, the USVI has already determined that TKH's share for one U.S. territory, alone, is over $8 million. That sum does not include the USVI's claims against TKJP and Honda. Nor does it include the other action brought by the USVI against certain of the Consenting OEMs, or the three other State Actions (two by Hawaii and one by New Mexico), or the Individual Actions alleging claims for personal injury and economic loss claims on behalf of individuals, statewide classes, and nationwide classes. As in *Lomas*, it would not be possible for the Debtors to be bystanders in the Actions. Doing so would risk adverse judgments, and record taint, in over 200 cases, which could increase claims against the estate by tens of millions of dollars—if not more. Therefore, the Debtors would be required to participate, at least in some form, in the Actions, effectively denying them the protections of the automatic stay, which, in turn, would divert the Debtors' human and financial capital away from the restructuring process.

**B.      It Is Appropriate to Enjoin the Actions Against the Consenting OEMs.**

Courts "generally use" two factors to determine whether it is appropriate to expand the automatic stay's protections to non-debtors under Section 105(a). *W.R. Grace*

32

*I*, 386 B.R. at 30 (collecting cases). Those factors are whether: (i) the non-debtor and debtor share an identity of interest such that a suit against the non-debtor is essentially a suit against the debtor, and (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. *See id.* Both factors are present here.

1.     *The Debtors Share an Identity of Interest With the Consenting OEMs.*

A debtor shares an identity of interest with a non-debtor where the debtor's conduct is "at the core of the issues raised" in the actions against the non-debtor. *See id.* at 30–31. Here, Judge Fitzgerald's decisions in *W.R. Grace* are instructive because Takata's alleged conduct predominates *all* claims against the Consenting OEMs.

Judge Fitzgerald enjoined claims against non-debtor BNSF railroad—over BNSF's objection—because the non-debtor and debtors shared an identity of interest. *See id.* at 36. The debtors, W.R. Grace, had mined ore in Libby, Montana, which was then loaded onto BNSF's railroad cars and transported across the country. *See id.* at 24. Libby residents, among others, sued for asbestos-related injuries allegedly caused when clouds of dust from the train cars drifted into the community. *See id.* Because the non-debtor alleged the debtors' actions were the proximate cause of the individual plaintiffs' injuries, and the debtors owed the non-debtor contractual indemnification obligations, the court held that the non-debtor and debtors shared an identity of interest. *See id.* at 31. In so finding, the court expressly rejected the argument that the "unusual circumstances" could not be satisfied where the non-debtor was allegedly independently liable. *See id.*at 30. Rather, the actions against the non-debtor would have directly impacted the bankruptcy estate because the non-debtor's liability allegedly arose from its dealings with the debtors; therefore, the debtors would be *required* to defend those actions. *See id.* at 29–

31; *see also In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at \*4 (Bankr. D. Del. Apr. 29, 2004) (staying suit against non-debtor that purchased one of debtors' subsidiaries because non-debtor was entitled to contractual indemnification and debtors' subsidiary's actions constituted the basis for the claims against the non-debtor).

Here, Takata's airbag inflators are the foundation of *all* Actions against the Consenting OEMs. The State Actions seek various forms of relief arising out of or related to Takata's inflators. Certain Individual Plaintiffs allege personal injury or wrongful death related to these same products. Others seek to recover economic damages associated with an alleged diminution in value of their automobile, due to Takata airbag inflators being incorporated into their car. Still others seek statutory damages for failure to procure and replace Takata airbag inflators within a specified timeframe. In every case, the use of defective PSAN inflators designed, manufactured, and sold by the Debtors lies at the core of the allegations against both Takata and the Consenting OEMs. And in every case, the Consenting OEMs take the position that all liability should fall on Takata, not the OEMs, which deny knowledge of the defect at the time they purchased the airbag inflators. These circumstances satisfy the identity of interests factor. *Arnold v. Garlock, Inc.*, 278 F.3d 426, 440 (5th Cir. 2001) (discussing *In re Dow Corning*, 86 F.3d 482 (6th Cir. 1996)).

> 2. *Allowing the Actions to Continue Against the Consenting OEMs*
> *Would Adversely Affect the Debtors' Restructuring Efforts.*

Actions against a non-debtor should be stayed where allowing them to proceed would adversely impact the debtor's reorganization. *See, e.g.*, *Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 379 (Bankr. E.D. Pa. 2009) (citing *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997);

*In re Monroe Well Service, Inc.*, 67 B.R. 746, 751-52 (Bankr. E.D. Pa. 1986)). Here, the continued prosecution of the Actions against the Consenting OEMs would adversely affect the restructuring efforts in several ways.

*First*, the Consenting OEMs' willingness to commit substantial financial and administrative resources to the restructuring justifies enjoining the Actions against them. *See In re Third Eighty-Ninth Assoc.*, 138 B.R. 144, 147–148 (S.D.N.Y. 1992) (where present and substantial, non-debtor's willingness to inject funds into reorganization justifies relief under Section 105); *In re Otero Mills, Inc.*, 21 B.R. 777 (Bankr. D.N.M. 1982) (permanently enjoining action against non-debtor who intended to contribute to the reorganization). The accommodations and other liquidity enhancements being provided by the Consenting OEMs ensure that the Debtors have sufficient liquidity to operate during these Chapter 11 Cases, which, in turn, allows the Debtors to continue manufacturing replacement kits in connection with the worldwide recalls. *See* First Day Decl. ¶9. Moreover, the Debtors require the Consenting OEMs' continued diligence in negotiations to meet the milestones set forth in the Global Accommodation Agreement, finalize the Chapter 11 Plan, and consummate the Global Transaction to fulfill their obligations under the DOJ Order. As with the Debtors' employees, diverting the Consenting OEMs' resources and attention from the reorganization could disrupt the efforts needed to complete these critical reorganization tasks.

*Second*, the Actions implicate the Debtors' airbag inflators, and the agreements between the Debtors and Consenting OEMs contain contractual indemnification provisions. Absent a stay, the Debtors would need to expend resources—time, attention, and cash—addressing issues arising in the Actions to protect their interests. *See, e.g.*,

*W.R. Grace I*, 386 B.R. at 31–32 (adverse impact on debtors' reorganization was "obvious" where contractual indemnity would require debtor to expend resources). If this Court does not stay the Actions against the Consenting OEMs, Takata employees (including the Debtors') might also be subjected to third-party discovery requests, burdening the Debtors and distracting them from negotiating and executing the Global Transaction and the Chapter 11 Plan.

*Third*, forcing the Debtors to address issues in the State Actions and Individual Actions to prevent the adverse effects of indemnity, collateral estoppel, and record taint, would "encumber the estates with additional litigation burdens from which the stay specifically protects them." *Id.* at 34. For example, Scott Caudill and Ken Bowling, among others, would likely have to spend time overseeing and assisting in protecting Takata's interests in the Actions and potentially would have to testify, rather than focusing their complete efforts on finishing the negotiations for a consensual reorganization plan. And Takata engineers may have to spend time preparing for, and testifying at, depositions and trials regarding Takata's design and manufacturing processes, instead of focusing on producing replacement kits for recalled vehicles. Similarly, if former Takata employees are deposed, Takata may be forced to prepare for and attend depositions in order to protect its interests. This would deprive the Debtors of one of the Bankruptcy Code's fundamental protections. *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986); *see also A.H. Robins*, 788 F.2d at 998 (among other things, Section 362's purpose is "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization").

### C.    The Equities Weigh in Favor of Enjoining the Actions Against the Consenting OEMs.

The equities weigh in favor of the Court exercising its discretion to enjoin the actions. *See supra* 16; *In re Monroe Well Service, Inc.*, 67 B.R. at 755 (debtor successfully enjoined lien creditors from compelling payments from non-debtors). *First*, as detailed above, the Debtors are likely to restructure successfully. And, any uncertainty on this issue should be resolved in favor of the Debtors at this stage. *See id.* (citing *Dore & Assocs. Contracting Co. v. Am. Druggists' Ins.*, 54 B.R. 353, 359 (uncertainties should be resolved in the debtors' favor early in the bankruptcy case)).

*Second*, the continued prosecution of either the State Actions or the Individual Actions would irreparably harm the Debtors. Because Takata's airbag inflators are at the "core of the issues raised," in the Actions and the relevant agreements between the Debtors and the Consenting OEMs contain contractual indemnification provisions, *see supra* Section III.A.1., Takata (including the Debtors) would likely need to address issues in the Actions to defend their conduct and airbag inflators — thus wasting estate resources better spent on the restructuring efforts. Specifically, the Debtors' participation would (i) divert Takata's senior management's focus from these Chapter 11 Cases, (ii) divert other Takata employees' attention away from manufacturing safe replacement kits, and (iii) reallocate Debtors' assets to fund litigation efforts. In contrast, should the Debtors elect not to address these issues, they risk exposing themselves to collateral estoppel and evidentiary prejudice in the pending actions. That risk is particularly acute here because allowing the State Actions to proceed against the Consenting OEMs might incentivize other states to bring claims against car manufacturers, which would only thin the Debtors' dwindling resources. And should the Individual Plaintiffs obtain judgments

against the Consenting OEMs, it could substantially increase the Consenting OEMs' claims against the estate, which, in turn, would diminish the distribution other prepetition creditors are expected to receive. Moreover, any actions that would proceed now against the Consenting OEMs could cause the Debtors to incur immediate obligation for legal defense bills.

*Third*, the irreparable harm to Debtors outweighs any potential harm to the States or Individual Plaintiffs. *See In re Union Trust Phila.,* LLC, 460 B.R. at 660 (fact that plaintiffs' efforts to collect from non-debtors might be delayed was insufficient to outweigh potential harm to bankruptcy estate if debtor was deprived of full assistance of non-debtors); *In re Monroe Well Service*, 67 B.R. at 755–56 (equities weighed in favor of enjoining actions against non-debtors because court could see "no impact" "other than a delay, of limited duration, in the enforcement of [the creditors'] rights"). Staying the Actions against the Consenting OEMs would merely delay the prosecution of claims. And, as detailed above, any relief seeking to force the Debtors and the Consenting OEMs to recall and repair defective airbag inflators is already addressed through the NHTSA Consent Orders. That the States will have to wait to prosecute their cases does not outweigh the potential harm to the Debtors—namely, a failed restructuring—if the State Actions are allowed to proceed against the Consenting OEMs. Similarly, the Individual Plaintiffs can resume their claims against the Consenting OEMs at a later date, if necessary, depending on how portions of the Chapter 11 Plan develop; thus, staying the Actions would cause no appreciable harm to the Individual Plaintiffs. In fact, in light of the recent formation of the Economic Loss and Injury Committee, the Individual

Plaintiffs' interests are adequately represented and protected in the bankruptcy proceeding. Thus, the balance of hardships favors the Debtors.

*Finally*, for the reasons stated above in Section I.B.4, allowing the Actions to proceed would *harm* the public interest. Every dollar the Debtors spend in connection with the Actions is one less dollar they can dedicate to maintaining their operations. Siphoning the Debtors' resources in this way would diminish (i) their ability to develop, produce, and install safe replacement kits, *i.e.*, precisely the type of prospective relief the States seek, and (ii) the size of the bankruptcy estate, from which the Individual Plaintiffs hope to recover.

## <u>CONCLUSION</u>

For the above reasons, the Debtors respectfully request that this Court preliminarily enjoin the continued prosecution of the Actions.

Dated: July 13, 2017
Wilmington, Delaware

*/s/  Russell C. Silberglied*

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701


-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Theodore E. Tsekerides
Konrad Cailteux
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*